MIGUEL ALERS, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. J. M. ALMODÓVAR ACEVEDO, JUEZ, demandado.

*Número:* 3.   *Resuelto:* 13 de Octubre de 1961.

_____

*Benjamín Ortiz,* abogado del peticionario; *J. B. Fernández Badillo, Secretario de Justicia, Arturo Estrella, Secretario Auxiliar de Justicia, Edgar S. Belaval, Procurador Auxiliar, M. B. Carrasquillo, Ernesto C. Blanco, José Freyre Díaz, Waldo Santiago* y *Lydia F. Marcos,* abogados de la Comisión de Servicio Público.

Sala integrada por el Juez Asociado Señor Santana Becerra, como Presidente Accidental de Sala, y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

La Comisión de Servicio Público por resolución de 17 de enero de 1957 concedió al aquí peticionario un certificado de necesidad y conveniencia para operar tres ómnibus en la ruta de la Calle Loíza a Carolina. El 8 de febrero, o sea veintidós días después, "La Cubanita Auto Bus", que antes había comparecido a oponerse a la concesión de la franquicia, radicó una moción solicitando nueva audiencia. El 18 siguiente radicó el peticionario un escrito oponiéndose a las pretensiones de "La Cubanita". La Comisión señaló para vista ambas cuestiones y mientras tanto suspendió los efectos de la orden del 17 de enero.

El artículo 75 de la "Ley de Servicio Público de Puerto Rico" (27 L.P.R.A. sec. 224) establece un término de 15 días dentro del cual debe hacerse cualquier solicitud de reconsideración a una declaración, decisión u orden de la Comisión. Por así disponerlo la ley, el aquí peticionario se opuso a la concesión de nueva audiencia solicitada por "La Cubanita", ya que su solicitud había sido radicada fuera del término. La resolución de la Comisión hemos visto fue de fecha 17 de enero y la solicitud de nueva audiencia de 8 de febrero. Esto no obstante, la Comisión oyó prueba relacionada con la oposición de "La Cubanita". La prueba fue al efecto de que el peticionario no cumplía con ciertas leyes relacionadas con los choferes, y al resolver el caso dejando sin efecto la resolución del 17 de enero se expresó así la Comisión:

"La Comisión, considerada la circunstancia del caso así como la prueba presentada por ambas partes es de opinión que para resolver el mismo, además de considerar la existencia o no de la conveniencia y necesidad pública, debe considerar la prueba aportada por la opositora sobre las actuaciones del peticionario en relación con las Leyes vigentes de seguro social para chóferes y los decretos mandatorios de la Junta de Salario Mínimo. Al analizar esta prueba encontramos que el peticionario con anterioridad a la radicación de su solicitud actuó en contra de lo

dispuesto en la Ley sobre Seguro Social de Choferes y los decretos mandatorios, legislación de alto alcance social que no debe evadir su cumplimiento ningún porteador público, ya que al hacerse cualquier concesión por esta Comisión, es deber del concesionario no solamente cumplir con nuestras disposiciones reglamentarias sino con cualesquiera otras leyes aprobadas por el Estado Libre Asociado de Puerto Rico."

Recurrió el peticionario al Tribunal Superior, Sala de San Juan para revisar las actuaciones de la Comisión. El Tribunal Superior confirmó y acudió entonces ante nos mediante solicitud de certiorari, que expedimos.

Para sustanciar su recurso apunta que la solicitud de nueva audiencia por "La Cubanita" fue radicada fuera de término y que la Comisión no podía considerar otros factores que no fueran los de necesidad y conveniencia al resolver sobre la solicitud del aquí peticionario.

■■ Consideremos en primer lugar la cuestión de la tardanza en radicar la solicitud de nueva audiencia. Dispone el artículo 75 de la Ley de Servicio Público, antes citada:

"Después de haberse hecho cualquier declaración, decisión u orden por la Comisión, cualquier compañía de servicio público o corporación municipal que fuere afectada por ella, o cualquier querellante en el procedimiento, o cualquier persona, corporación municipal o compañía de servicio público, o asociación a la cual la Comisión hubiere permitido intervenir debidamente, mediante petición adecuada y causa justificada, podrá solicitar dentro de los quince días después de la notificación de dicha orden, una nueva audiencia en lo que respecta a cualquier asunto determinado por la Comisión mediante audiencia, o investigación y orden dictada en dicho asunto; . . ."

Vistos los términos claros y terminantes de la disposición transcrita, es claro que la moción radicada por "La Cubanita" fue tardía. Pero "[l]a Comisión tendrá poder para rescindir o modificar declaraciones, decisiones u órdenes dictadas en virtud de las disposiciones de esta parte [Ley], mediante el aviso y en la forma que considere convenientes, y podrá

conceder una nueva audiencia por causa justificada", según lo dispuesto por el artículo 73 (27 L.P.R.A. sec. 222) de la propia ley. Es fundándose en esta disposición que la Comisión *motu proprio* podía celebrar una nueva audiencia para considerar cuestiones adicionales relacionadas con la determinación que había hecho concediéndole un certificado de necesidad y conveniencia al aquí peticionario.

Así se ha interpretado una disposición similar en el estado de Pennsylvania, de donde el propio peticionario admite proviene nuestra ley. Establece la ley de ese estado, al igual que la nuestra, que las peticiones de reconsideración deben radicarse dentro de los quince días después de haberse dictado una orden. Sección 1006 del Public Utility Law, Pa. Stat. Ann. tit. 66 § 1396 (1959). Pero al igual que nuestro artículo 73, la sección 1007 de la Ley antes citada (sec. 1397 de los Estatutos Anotados) dispone:

"La Comisión puede en cualquier momento, luego de la oportuna notificación y audiencia, según se provee para el caso de querellas, rescindir o enmendar cualquier orden dictada por ella . . ."

En el caso de *Paradise* v. *Pennsylvania Public Utility Commission*, 132 A.2d 754 (Penn. 1957) la corte tuvo ante sí una situación parecida a la que ahora estamos considerando. ¿Puede la Comisión celebrar una nueva audiencia, cuando la petición a ese propósito es radicada fuera del término establecido por ley? Al resolver la cuestión se expresó así el Tribunal:

"Convenimos con el apelante en que la sección 1007 no autoriza a la Comisión a revivir una solicitud tardía de reconsideración bajo la sección 1006. Sin embargo, la radicación de tal solicitud no puede restringir la facultad de la Comisión de actuar separadamente bajo la sección 1007. La línea divisoria entre la reconsideración bajo la sección 1006 y una investigación independiente bajo la sección 1007 puede resultar con frecuencia muy sutil, y no nos sentimos inclinados a restringir la facultad de la Comisión simplemente a causa de terminología que dista

mucho de lo ideal. La verdadera controversia en esta apelación es si se ha cumplido con los requisitos de la sección 1007 . . ."

Y la sección 1007 lo que requiere igual que el artículo 73 de nuestra ley es que se celebre una nueva audiencia, que fue lo que aquí hizo la Comisión. Al igual que en Pennsylvania las disposiciones del artículo 75 de nuestra ley no pueden impedir que la Comisión actúe al amparo del artículo 73.

Al tratar sobre el poder de los organismos administrativos para revisar en cualquier momento sus órdenes y resoluciones se afirma en un estudio que aparece en el volumen correspondiente al año 1942 de la Revista Jurídica de Wisconsin a la pág. 5, específicamente a la pág. 19:

"Generalmente estos mismos principios son aplicados por las comisiones de servicio público estatales. Frecuentemente estas comisiones promulgan reglamentos procesales en los cuales se establece un término limitado dentro del cual una parte afectada puede solicitar una reconsideración o la reapertura del caso. Estas reglas no derogan la jurisdicción continua de la comisión, la cual puede motu proprio reconsiderar un caso, aun cuando el término establecido en dichas reglas haya expirado. . ." Schopflocher, *The Doctrine of Res Judicata in Administrative Law,* (1942) Wis. L. Rev. 5.

Véase además: *Toledo Edison Co.* v. *Public Utilities Commission,* 118 N.E.2d 531 (Ohio 1954) ; *Pittsburgh & L. E. R. Co.* v. *Public Utilities Commission,* 191 N.E. 467 (Ohio 1954) ; *Froeber-Norfleet* v. *Southern Ry. Co.,* 9 F. Supp. 409 (D.C. N.D. Ga. 1934).

La Comisión estaba justificada en reabrir el caso para conocer de la situación que había venido a conocimiento de ese cuerpo, la idoneidad de la persona a quien se le estaba concediendo el certificado de necesidad y conveniencia. Y aquí entramos a considerar la otra cuestión levantada por el peticionario al efecto de que la Comisión al conceder un certificado de necesidad y conveniencia no puede considerar el carácter y la conducta del solicitante. Nos cita el peticionario autoridades que sostienen su posición. *Librizzi* v.

*Plunkett,* 16 A.2d 280 (N. J. 1940) ; *Bradley* v. *Arizona Corporation Commission,* 141 P.2d 524 (Ariz. 1943) y un caso de Pennsylvania, *Slater* v. *Penn. Public Utilities Comn.,* 98 A. 2d 743 (Penn. 1953). En este último caso el concesionario había estado operando bajo un certificado expedido a nombre de una sociedad de la cual él formaba parte y que fue disuelta, pero había seguido cumpliendo con las órdenes y reglamentos de la Comisión de Servicio Público de Pennsylvania. Teniendo esto en cuenta la Comisión le concedió un certificado a su nombre y en apelación el opositor sostuvo no debió concedérsele ya que había violado la ley al continuar operando con el certificado de la sociedad. La Comisión entendió que esta violación no ameritaba negarle el permiso solicitado, habida cuenta que siempre cumplió con las órdenes y reglamentos. El tribunal entendió que no había nada que justificara alterar la conclusión de la Comisión, y esto es lo que en realidad resuelve dicho caso, ya que era su norma sostenerlas a menos que fueran arbitrarias y no estuvieran sostenidas por la evidencia. Y en este caso no era arbitraria la conclusión y estaba sostenida por la evidencia.

■ Ahora, independientemente de lo que a ese efecto puedan haber decidido otras jurisdicciones, nos parece que en su poder de reglamentar la transportación pública la Comisión no sólo puede, sino que debe, tomar en consideración la idoneidad de los que pretenden prestar un servicio público reglamentado por la Comisión. Sería inconcebible que, no importa la necesidad que hubiere de prestar un servicio de transporte, si la persona que lo solicita es una que vive al margen de la ley, la Comisión tuviera que concederle un certificado de necesidad y conveniencia. Que un organismo que reglamenta la concesión de certificados de necesidad y conveniencia puede considerar el carácter y la conducta de un solicitante se ha sostenido en el propio estado de Pennsylvania, *Byham* v. *Pennsylvania Public Utility Commission,* 67 A.2d 626 (Penn. 1949) ; *D. F. Bast. Inc.* v. *Pennsylvania*

*Public Utility Com'n.*, 138 A.2d 270 (Penn. 1958). Y en otras jurisdicciones *Cutrona* v. *Mayor and Council*, 124 A.2d 658 (Del. 1924); *Alspaugh* v. *Public Utilities Commission*, 65 N.E.2d 263 (Ohio 1946). Véase además 1 Blashfield *Cyclopedia of Automobile Law & Practice*, sec. 473 (ed. 1948).

Las violaciones que al aquí peticionario le imputaron y las cuales estimó probadas la Comisión, están relacionadas con la falta de pago del seguro social para choferes y el no cumplir con decretos mandatorios de la Junta de Salario Mínimo. Pero es que es algo más que el mero no cumplimiento con las disposiciones de unas leyes de hondo carácter de justicia social que afectan directamente a las personas que trabajan para un concesionario de un certificado de necesidad y conveniencia. Es la actitud asumida por el peticionario cuando un inspector del negociado encargado en hacer cumplir una de esas leyes le visita investigando el asunto. El inspector acude al peticionario y éste le informa que los ómnibus pertenecen a su hermano. El hermano luego le informa que pertenecen al peticionario. Es su actitud tratando de evadir el cumplimiento de la ley. A ese respecto declaró el inspector:

"Yo lo que le quiero decir a la Comisión como funcionario público, que Miguel Alers dice que no tiene guaguas que son de Juan y cuando voy donde Juan dice que no son de Juan sino de Miguel y he tenido que recurrir a los tribunales."

¿Qué garantía tendría la Comisión de que el peticionario cumpliría con las propias órdenes y reglamentos de la Comisión? Aun aquéllas que se relacionen con la seguridad pública. Obviamente el criterio no debe ser que la Comisión tiene poder para hacerlas cumplir. ¿Es que acaso no hay personas que buenamente las cumplan? Siempre debe preferirse para rendir servicios públicos a aquellas personas cumplidoras de la ley. Es una garantía para todos.

■■■No hay base alguna para sostener que el tribunal de instancia erró al confirmar la decisión de la Comisión. Recientemente en *Comisión Servicio Público* v. *Metro Taxicabs*, 82 D.P.R. 999 (1961) dijimos que la función del tribunal de instancia en estos casos "era una exclusivamente judicial: determinar si a la luz de los hechos, y demás circunstancias presentes en el récord certificado a ser apreciadas, el fallo de la Comisión era o no razonable, de acuerdo con la ley, y fundado en evidencia competente". ¿Podría sostenerse que el fallo de la Comisión en el caso de autos no es razonable y que no está fundado en evidencia competente? Y afirmamos en el caso de la *Metro*: "El Tribunal no ha de sustituir a la Comisión". Al sostener la decisión del tribunal de instancia, una vez más ratificamos ese criterio.

No se cometieron los errores que el peticionario señaló. *Se anulará el auto expedido.*

El Juez Asociado señor Santana Becerra disintió en opinión separada.

———

Opinión disidente del Juez Asociado señor Santana Becerra.

En 19 de agosto de 1955 Miguel Alers compareció ante la Comisión de Servicio Público pidiendo que aprobara el traspaso que por motivos de salud le hacía su hermano Juan Alers, de cinco certificados de necesidad y conveniencia, cuatro cubriendo la ruta de Calle Loíza a Carolina y uno de Boca de Cangrejos a San Juan vía Fernández Juncos. Juan Alers murió poco después del traspaso. Después de varios trámites y vistas, la Comisión siguió el caso como una solicitud original de franquicia para explotar esas rutas. Finalmente en 11 de diciembre de 1957 dictó resolución denegando en definitiva la concesión solicitada, por los siguientes fundamentos:

"La Comisión, considerada la circunstancia del caso así como la prueba presentada por ambas partes es de opinión que para

resolver el mismo, además de considerar la existencia o no de la conveniencia y necesidad pública, debe considerar la prueba aportada por la opositora sobre las actuaciones del peticionario en relación con las leyes vigentes de seguro social para choferes y los decretos mandatorios de la Junta de Salario Mínimo. Al analizar esta prueba encontramos que el peticionario con anterioridad a la radicación de su solicitud actuó en contra de lo dispuesto en la Ley sobre Seguro Social de Choferes y los decretos mandatorios, legislación de alto alcance social que no debe evadir su cumplimiento ningún porteador público, ya que al hacerse cualquier concesión por esta Comisión, es deber del concesionario no solamente cumplir con nuestras disposiciones reglamentarias sino con cualesquiera otras leyes aprobadas por el Estado Libre Asociado de Puerto Rico.

En cuanto a la necesidad y conveniencia del servicio, la prueba fue completamente contradictoria, mientras el peticionario trató de probar con sus testigos tal conveniencia y necesidad, la opositora trató de probar con la suya que en la actualidad los medios de transportación para cubrir la ruta de la Calle Loíza a Carolina está justa y adecuadamente servida."

La Sala de San Juan del Tribunal Superior confirmó la resolución y el caso llegó ante nos.

Nada tengo que oponer al criterio que en términos generales expresan mis distinguidos compañeros de Sala en cuanto a que "Independientemente de lo que a ese efecto puedan haber decidido otras jurisdicciones, nos parece que en su poder de reglamentar la transportación pública la Comisión no sólo puede, sino que debe, tomar en consideración la idoneidad de los que pretenden prestar un servicio público reglamentado por la Comisión." Pero como ocurre siempre con los principios generales, la dificultad comienza cuando tenemos que enfrentarlos a situaciones específicas. Aquí estamos ante un caso específico.

El problema que se suscita es más agudo de lo que a primera vista aparenta ser. Las órdenes de la Comisión deben estar "de acuerdo con la ley." *Arts.* 83 y 85, Ley 70 de 1917. Hasta qué punto la Comisión de Servicio Público, no en su

facultad cuasi legislativa de reglamentación general, sino en su función cuasi judicial de adjudicar los derechos de un peticionario puede, *en ausencia de disposición de ley*, sancionar el incumplimiento de otras leyes y negar una concesión a la cual de otro modo habría derecho,—fuera de aquellos casos en que el incumplimiento versare sobre cosas que están substancialmente integradas a la concesión en sí como lo sería la seguridad pública, por ejemplo, en el caso de un porteador,—es el problema básico aquí presente. A veces el Legislador ha dispuesto que la inobservancia de la ley surta efecto en otras áreas y de ello hay innumerables situaciones. [1]

En los tiempos del presente en que prácticamente todo tipo de empresa y actividad económica está intervenido con minuciosidad por reglamentación de ley en sus diversas esferas de relación, el concepto de idoneidad adquiere un sentido de vasto alcance. Lo que se acepta como bueno en este caso de un porteador, podría surgir con cualquier otro tipo de negocio o por cualquier otra modalidad de inobservancia. ¿Podría negarse la franquicia a una empresa porque se le hubiere imputado o probado falta en el pago de las contribuciones o cualquiera otra violación de ley parecida? ¿Podría negarse una franquicia para la toma de agua, a una central por ejemplo, porque hubiere incumplido la Ley Azucarera en cuanto al pago debido a sus colonos o en cualquier otro aspecto, o que en alguna forma no hubiere observado las disposiciones de la Ley de Seguro de Empleo en dicha industria? ¿Podría negarse porque la empresa peticionaria tenga o haya tenido cargos ante la Junta de Relaciones del Trabajo por prácticas ilícitas de trabajo, o porque se le imputara o pro-

---

[1] Así por ejemplo, por el no pago de la contribución de herencia, además de la sanción específica que tiene en el propio campo, se prohíbe a un administrador la repartición de los bienes, a un juez que la apruebe, a un registrador que la inscriba, etc. Una excelente ilustración la da el *Art.* 11 de la Ley 130 de 1945, 29 L.P.R.A. § 72.

bara no haber pagado el salario mínimo, y así sucesivamente en sus demás relaciones sujetas a reglamentación? Yo no estoy preparado para dar una contestación categórica, ni sería ahora necesario, porque aun en la posición de derecho que asumió la Comisión su fallo a mi entender no es razonable ni de acuerdo con la ley a tenor del récord. Pero no se me oculta que el asunto puede tener, cuando menos, proyecciones que después de sancionado lo de hoy probablemente haya que afrontar en un futuro.

Ante la petición de traspaso de los cinco certificados la Comisión ordenó a su abogado un estudio de los expedientes de los mismos, resultando del informe rendido en 10 de agosto de 1956 y de la declaración del abogado en una vista celebrada posteriormente, que la situación de dichos expedientes era muy confusa, los certificados estaban vencidos desde 1947 y 1949 y sólo dos, traspasados a Juan Alers y dos vehículos, habían estado operando recientemente. En efecto, con la petición se acompañó copia de dos licencias de ómnibus públicos para el año 1955–56 expedidas por el Secretario de Obras Públicas a nombre de Juan Alers. Con miras al informe la Comisión, en 5 de septiembre de 1956, ordenó una vista posterior y que se notificara la petición a otros porteadores para determinar si procedía aprobar los traspasos solicitados y la reanudación del servicio bajo los mismos. Se opuso "La Cubanita Autobus Co. Inc." por escrito aduciendo entre otras cosas que los vehículos que alegaba poseer el peticionario habían sido retirados, operando uno solamente en forma irregular e insegura, suspendiendo con frecuencia el servicio por distintas razones; que los vehículos no eran de Juan Alers y sí operados por el peticionario y que por el estado deplorable de abandono en que estaban y por otras razones la Comisión debía cancelar definitivamente dichos certificados. En una vista celebrada el 3 de octubre de 1956 en que el Comisionado que la presidía manifestó que el peticionario debía probar que esas guaguas le habían pertenecido

siempre a pesar de estar a nombre de Juan Alers, y la necesidad y conveniencia del servicio, el peticionario declaró aceptando esos hechos.

El 17 de octubre de 1956, después de la anterior vista, la Comisión ordenó a su Negociado de Inspección que realizara un estudio del movimiento de pasajeros en la ruta Calle Loíza–Carolina. Realizado el estudio por tres inspectores radicaron un informe en 5 de diciembre de 1956 recomendando, por razones de necesidad del servicio, la aprobación de la solicitud de traspaso y que se restituyeran aquellas autorizaciones que habían estado siendo utilizadas recientemente. En 17 de enero de 1957 la Comisión dictó resolución concluyendo que existía la necesidad y conveniencia pública y que debía autorizar más medios de transportación en ómnibus en la ruta expresada, concediendo al peticionario "quien es un antiguo porteador con gran experiencia en este servicio", una franquicia por tres años para operar tres ómnibus en la ruta Calle Loiza–Carolina. Le concedió 15 días para que sometiera horarios y las tarifas bajo las cuales habría de operar, y que una vez sometidos dichos horarios se redactaría la franquicia para ser sometida al Gobernador.

En 5 de febrero de 1957 el peticionario sometió los horarios y tarifas. En 8 de febrero de 1957 el porteador "La Cubanita Autobus Co. Inc." solicitó la concesión de una nueva audiencia porque no había tenido oportunidad de leer el informe del Negociado de Inspección y porque la concesión era contraria a derecho. En 6 de marzo de 1957 se ordenó la nueva vista. (2)

En 27 de marzo de 1957 se celebró la última vista en la cual se aportó abundante prueba por una y otra parte en

---

(2) Del récord aparece que en 19 de marzo de 1957 el Director Ejecutivo de la Autoridad de los Puertos Sr. Salvador Caro, envió una comunicación al Presidente de la Comisión en donde, aparte de otros hechos, le informaba que no existía una verdadera necesidad del servicio que intentaba ofrecer el peticionario. Esta comunicación no aparece notificada al peticionario, ni la Autoridad de los Puertos compareció a la vista a hacer oposición.

cuanto a la necesidad y conveniencia del servicio solicitado. Todo este procedimiento comenzó y se estuvo tramitando como uno sobre el traspaso de certificados ya concedidos, pero en el curso de la vista el Presidente de la Comisión manifestó que el caso se estaba considerando como si fuera una petición de necesidad y conveniencia original. La opositora "La Cubanita Autobus Co. Inc." sentó a declarar como testigo al inspector del Negociado de Seguro Social para Chóferes, quien manifestó que desde 1953 había estado interviniendo con el peticionario y con su hermano Juan Alers en relación con el seguro social para chóferes inquiriendo tanto del uno como del otro el cumplimiento de la ley de 1950 que establecía dicho seguro, y ni el uno ni el otro habían cumplido con la misma; que de acuerdo con una lista que le suministrara la Comisión en el año 1950 aparecía el peticionario con cinco permisos y nunca cotizó por los chóferes que utilizaba. Que al disponerse a acudir a los tribunales, Miguel Alers le había dicho que él nunca explotaba guaguas y que éstas eran propiedad de su hermano. Juan Alers, por otra parte informó al testigo que las guaguas eran del peticionario; que por cierta transacción de familia habían comparecido a la Comisión y traspasado los ómnibus y él no tenía que cumplir con dicho requisito de ley. El testigo rindió un informe al Negociado de Seguro Social, hicieron una investigación, encontraron que Miguel Alers había hecho el traspaso de los certificados y radicaron en el Tribunal Superior un caso contra Juan Alers obligando a Alers a cumplir con la ley. Fallecido Juan Alers, a esa fecha el caso estaba pendiente ante el Tribunal de ser seguido contra los herederos. Declaró además el testigo que la Comisión aparecía concediendo cinco permisos a Miguel Alers quien no cumplió con la ley hasta que un chofer le dijo en octubre de 1956, que Juan Alers lo había utilizado en una guagua, y que el peticionario le informó que para evitarse un pleito ya que su hermano tenía un caso radicado él iba a llenar su ingreso y pagar lo de dos chóferes que mencionó.

En esa etapa del interrogatorio el Presidente de la Comisión intervino explicándole al testigo que según el informe el peticionario había operado dos ómnibus del 1946 al 1950 y luego dispuso de los vehículos y que a partir de 1950 las guaguas aparecían a nombre de Juan Alers. En cuanto a salarios, un testigo mencionó tres casos, uno contra el peticionario, otro contra el hermano y uno contra ambos, según un recuerdo superficial por concepto de vacaciones y si mal no recordaba horas extras bajo el Decreto núm. 12. Dijo que en uno hubo sentencia contra el peticionario.

No ha mucho el Tribunal hizo una inequívoca expresión de la libertad de criterio de la Comisión de Servicio Público, no debiéndose alterar sus fallos a menos que no sean razonables, no estén de acuerdo con la ley y estén fundados en evidencia incompetente. *Comisión Servicio Público* v. *Metro Taxicabs*, 82 D.P.R. 999, (1961.) Aparte de cambiar la naturaleza de los procedimientos, a mi juicio la Comisión no hizo sino aplicar al peticionario una sanción específica por el alegado incumplimiento—más, cuando la cuestión del incumplimiento estaba en ese entonces *sub judice* ante un tribunal,—de otra ley que tiene sus propias sanciones, y sobre cosas que, según apunté, no son consubstanciales con la franquicia misma como serían un seguro sobre el propio equipo o medidas de seguridad. Hay protecciones judiciales en torno a este aspecto. (³) Tampoco creo que la negativa de la Comisión sería razonable por el temor o sospecha de no tener garantías de que el peticionario habría de cumplir sus órdenes. Aparte de que esto equivale a presumir anticipa-

---

(³) El *Art.* 9 de la Ley 428 de 1950 creando el seguro para chóferes según regía en diciembre de 1957 impone al patrono la obligación de cotizar y retener, etc. Un patrono que no ha cotizado puede ser demandado por el monto de los beneficios concedidos al chofer más una suma igual por penalidad. Según el *Art.* 10 tal como regía, el Secretario del Trabajo puede recobrar las cuotas no pagadas por el patrono más una suma igual por daños, etc. El *Art.* 13 declara delito menos grave el incumplimiento de esa ley o de sus reglamentos con penas máximas de $1,000 de multa, un año de cárcel, o ambas.

damente la violación de la orden como un factor del fallo, la Comisión tiene sanciones apropiadas para el incumplimiento de sus mandatos.

En realidad la Sala sentenciadora no basó su sentencia en las consideraciones que expresó la Comisión. Expuso que ésta había hecho la conclusión específica que en cuanto a la necesidad y conveniencia del servicio la prueba era contradictoria, y que al declarar luego sin lugar la solicitud y revocar la concesión otorgada equivalía—concluyó la Sala—"a dirimir el conflicto de prueba en forma adversa al apelante." Luego asumió que lo dicho por la Comisión no hacía la resolución errónea. La dificultad con la *inferencia* de la Sala sentenciadora estriba en que la Comisión denegó la franquicia expresando unos criterios y por el contrario, se abstuvo de hacer conclusión en cuanto a la necesidad y conveniencia del servicio, sobre lo cual versó casi toda la prueba. De modo que si la situación real y la verdadera razón del fallo pudo haber sido la inferida por la Sala sentenciadora, debería enviarse el caso a la Comisión para que haga las conclusiones pertinentes sobre la necesidad y conveniencia.

No debo terminar sin decir que por la Ley 85 de 14 de junio de 1960 se enmendó el artículo 10 de la Ley 428 de 1950 al efecto de que "los casos de empresas dedicadas al servicio de transporte público en los cuales haya recaído sentencia por no cumplir con la obligación de pagar la cotización que requiere la ley deberán ser notificados a la Comisión de Servicio Público de Puerto Rico a los fines de que ésta les dé la debida consideración cuando dichas empresas acudan ante ella en trámites relacionados con sus certificados de necesidad y conveniencia."

Aunque aplicara el espíritu de esa enmienda a un fallo dado dos años y medio antes de adoptarse, aún queda el hecho de que el Legislador impuso la condición razonable, y la salvaguarda a la vez, de que *hubiera recaído sentencia* por el incumplimiento.

Por las razones anteriormente expuestas lamento disentir.